[Civ. No. 33019. Second Dist., Div. One. Nov. 19, 1969.]

RICHARD A. PREISSMAN, a Minor, etc., et al.,
Plaintiffs and Respondents, v.
FORD MOTOR COMPANY et al., Defendants and Appellants;
MARYLAND CASUALTY COMPANY, Intervener and Respondent.

844 

## Counsel

Haight, Lyon, Smith & Nye, Haight, Lyon & Smith, Fulton W. Haight, Henry F. Walker, Morgan, Wenzel, Lynberg, Stearns & Morris, Morgan, Wenzel, Lynberg & McNicholas and William Marshall Morgan for Defendants and Appellants.

John F. O'Hara and William P. Camusi for Plaintiffs and Respondents.

Zonni, Ginocchio & Taylor and John B. Mestad for Intervener and Respondent.

## Opinion

**WOOD, P. J.**—This is an action for damages for personal injuries suffered by plaintiff Richard A. Preissman, a minor, when an automobile, which had been parked in a parking lot by defendant Michael Shay, rolled (unattended) down an incline and struck Richard, who was an attendant at the parking lot. One of the questions herein was whether there was a defect in the automobile mechanism for locking the transmission gears when the automobile was in a parked position. The automobile, which was manufactured by defendant Ford Motor Company, was owned by defendant John G. D'Ornellas, who purchased it from defendant Leon Ames Ford, a corporation, a distributor of Ford automobiles. Mr. Shay was an agent of defendant D'Ornellas. Intervener Maryland Casualty Company, which had issued a policy of workmen's compensation insurance to Richard Preissman's employer (Party Pack Company), made payments pursuant to the policy for medical expenses and temporary disability of Richard. Plaintiffs Archie Preissman and Mrs. Archie Preissman (parents of Richard) seek reimbursement for medical expenses incurred in the treatment of Richard's injuries. The jury trial proceeded upon the theory of negligence of all the defendants and strict liability in tort of defendants Ford Motor Company and Leon Ames Ford. Judgment upon the verdict was against the defen-

dants in the amounts of $235,000 for Richard, $8,931 for Mr. Preissman, and $36,606.07 for Maryland Casualty. Defendants Ford Motor Company and Leon Ames Ford appeal from the judgment. (Defendants D'Ornellas and Shay did not appeal.)

Appellant Ford Motor Company contends that the court erred in instructing the jury on the doctrine of res ipsa loquitur and on strict liability in tort. Appellant Leon Ames Ford makes similar contentions, and further contends that the evidence does not support the verdict.

On April 4, 1962, defendant D'Ornellas purchased a new (1962) Ford Galaxie automobile from defendant Leon Ames Ford, which distributed automobiles manufactured by defendant Ford Motor Company. He used the automobile in his business as a general contractor and drove it about 3,000 miles a month.

On September 28, 1962, Mr. D'Ornellas and Mr. Shay went in the automobile to a building in Los Angeles where Mr. D'Ornellas had a business appointment. Mr. Shay, who had driven the automobile on previous occasions, drove it into a parking lot adjacent to the building and stopped it near Richard, who was sitting in a chair reading a book. (Richard testified that he did not see the automobile enter the lot.) Mr. D'Ornellas got out of the automobile and went into the building; and Mr. Shay, who saw Richard reading the book, drove the automobile into a parking space and parked it. The parking lot sloped in that area, and he put the gearshift lever in "park lock," and went into the building.

Thereafter the automobile rolled down the slope in the parking lot and struck Richard. Richard testified that while he was sitting in the chair reading the book something brought his attention to the automobile, and he looked up and saw it coming toward him, about three feet away, and then there was a tremedous shock, the automobile struck him, and pinned his leg against a railing. A lady went into the building and said that she needed some help, and Mr. Shay went into the parking lot. He saw persons trying to push the automobile, and he ran to it, started the motor, moved the automobile and stopped it. Richard was taken to the hospital, and his left leg was amputated. An officer came to the lot after Richard had been taken to the hospital. Mr. Shay told the officer that he had parked the car in the stall and that he had put the gearshift in park position and had not applied the emergency brake. The officer examined the car and tested the parking brake, and there was no defect in the brake. (He could not recall whether he tested the gearshift.)

On the day after the accident, Mr. D'Ornellas telephoned Ames about the automobile, but he was not able to obtain an appointment to have it serviced until October 11, 1962. On that day he took the automobile to

Ames and told the service man (Mr. Civille) that it would not stay in park. The service order of October 11, 1962, includes the following entry: "Adj trans—won't stay in park." Mr. Civille drove the automobile and did not find anything wrong with the parking mechanism in the transmission.

On April 25, 1962, about 20 days after D'Ornellas had purchased the automobile, he left it with Ames for service. He told an employee of Ames that the front end vibrated. Ames balanced the wheels, applied underseal, and performed the 1,000-mile service. (The automobile had been driven about 2,000 miles.)

On July 5 or July 15,[1] D'Ornellas took the automobile to Ames for service. According to his testimony, he mentioned the front end vibration. According to Ames' order, the services performed included a "minor tune," replacement of a fuel filter, radio repair, and the 6,000-mile service. (The automobile had been driven about 8,000 miles.)

On September 11, 1962, D'Ornellas again brought the automobile to Ames for service. He complained to the service man that the front end was vibrating. He also said: "I would like you to check the front end, like you to check the transmission." He testified that he complained about the transmission because he "had trouble getting it into park [getting transmission or gearshift lever into locked position for parking]. It sometimes would go straight in. Sometimes it would stop, and I would have to jiggle it to click it in, and sometimes it didn't, so I was curious about it." Ames' service order included the following references to services performed: "Check front end. . . . check trans-linkage." In answers to interrogatories,[2] the president of Ames (Ralph Williams) stated that the transmission linkage had been inspected and adjusted on September 11, 1962. At the trial, Mr. Civille, a service representative of Ames, testified that he recalled talking with Mr. D'Ornellas on September 11; Mr. D'Ornellas complained about the front end vibrating; Mr. D'Ornellas did not say to check the transmission linkage; after he talked with Mr. D'Ornellas, he made the entries on the service order with reference to checking the front end and the transmission linkage; before work was done on the automobile, he drove it and checked the vibration and the transmission checked out, and nothing was wrong with it, and nothing was done to it; checking the transmission by driving it was sufficient; he put the gearshift lever in various positions as he drove the automobile and he was satisfied that it shifted into these positions; he put the gearshift lever in "Park" when the automobile was on an incline,

[1]The service orders were exhibits, but the exhibits have not been included in the record. In referring to the July service order at the trial, it was said that the order was dated—looks like July 5 or 15—probably July 5, 1969, indicating 6,000-mile checkup."

[2]Said interrogatories, and the answers thereto, were received in evidence.

and it held; he did not take anything apart or look inside the transmission; he did other road tests and sequential tests on the transmission; the transmission "quick-shifted," but that had nothing to do with the transmission linkage; no adjustment was made to the transmission; he believes that the answers to the interrogatories that the transmission had been adjusted probably referred to adjustment of a rod on the carburetor to the firewall linkage; and such adjustment has nothing to do with the transmission linkage. (The transmission linkage was received in evidence. It bears three "scorings" [arc-shaped gouge marks] which indicate that adjustments had been made thereto [see *infra*].) No adjustment was made to the motor mounts; and apparently the motor mounts were not inspected.

In December 1962, while the automobile was being driven by Mr. D'Ornellas' son, it was damaged in a collision. A repair bill for work performed on the automobile after the collision included straightening of the front bumper and the frame, replacing of head lamps, repairing the front fenders and the radiator, and removing and replacing the motor mounts.

From the testimony of several experts (and other evidence) it appears that the design and function of the gearshift and transmission of a 1962 Ford Galaxie automobile were in substance, as follows: The gearshift lever is in a console which is at the right of the driver's seat; and there are six shifting positions on a selector on the console—the positions are referrred to as low, drive one, drive two, neutral, reverse, and park. Park is the forwardmost position on the selector. Under the console, the gearshift lever is attached to an irregularly shaped piece of metal, referred to as the transmission linkage, which extends forward from the bottom of the gearshift lever to a pivoting lever on the outside of the transmission. The transmission is bolted to the rear of the motor in such manner that the engine and transmission form a fixed unit. The engine is attached to the chassis by means of three "motor mounts" (on left side, right side, and rear of engine); and the purpose of the mounts is to hold the engine in position and to isolate vibrations. (Each mount consists of steel bonded to rubber and it resembles a sandwich of steel and rubber.) When the gearshift lever is moved, the linkage moves the pivoting lever on the outside of the engine, and the pivoting lever causes the gears to shift within the transmission. Inside the transmission there is a rotating plate, referred to as a detent plate, which has notches corresponding to the shifting positions on the console selector. A rod from the detent plate is connected, by means of various linkages, to a pawl which engages the parking gear when the detent plate is in the park position. When the pawl is engaged in the parking gear, the parking gear operates (through a shaft connected to the drive shaft) so

as to lock the rear axle and rear wheels. When the automobile is assembled, the gears within the transmission are set at a certain position, the gearshift lever is set at the same position on the selector, and a bolt is inserted through a slot in the transmission linkage and a nut is tightened on the bolt. By such adjustment, the gears within the transmission are synchronized with the shifting positions on the console selector. (Thus, when the transmission and gearshift are synchronized, if the gearshift lever is in low, the gears within the transmission are in low, or if the gearshift lever is in another designated gear the transmission gears are in that gear; and when the gearshift is in park, the parking gear in the transmission is locked.) Correction of the synchronization, if necessary, is accomplished by adjusting the aforementioned bolt and nut on the transmission linkage. When such adjustment is made, the tightening of the nut produces a "scoring" on the linkage.

In the present case, as previously stated, the transmission linkage was received in evidence; and it has three scorings on it. One scoring is about .7 inch from the center of the three scorings; and the third scoring is about .84 inch from the center scoring. An adjustment which would produce a scoring of .7 inch distance from the scoring produced by the previous position of the nut would indicate that before the adjustment the gears in the transmission would have been in a gear, or possibly two gears, from the corresponding position of the gearshift on the console selector (e.g., before such adjustment the gears in the transmission would be in reverse, or possibly in neutral, when the gearshift was in park on the selector).

Other evidence was in substance that when the engine is operating, the torque from the engine causes the engine to lift upward on the left side, thereby exerting pressure on the left motor mount; when restrained by the left and right motor mounts, the engine can move forward and backward approximately one-tenth (.1) of an inch only; if the rubber portion of the left motor mount separates from the metal portion, the transmission can twist to the right or move backward; if the left motor mount is broken, the engine and transmission could move forward and backward .175 of an inch; if both the left and the right motor mounts are damaged, the engine and transmission could move forward and backward one-fourth (.25) of an inch;[3] if the engine transmission moved backward one-fourth of an inch, the gears in the transmission would be in reverse when the console selector

[3]Mr. Croom, an engineer called by defendant Ford Motor Company, testified that if the engine and transmission moved .27 inch, the gears in the transmission would shift from park to reverse; and that such result would vary on any automobile. Mr. Nass, an engineer called by plaintiffs, testified that a movement of .175 inch rearward by the engine and transmission would be sufficient to disengage the park-lock position of the gears in the transmission although the gearshift would remain at the park position on the console selector. He also testified that he examined another 1962 Ford Galaxie automobile and that it would roll backward when the transmission linkage was moved .125 inch from the park-lock position.

was in park; when an automobile accelerates rapidly, the motor and transmission tend to move backward, and when the automobile decelerates, they tend to move forward; in the event of a broken motor mount, the engine and transmission would move back and forth with acceleration and deceleration of the automobile, and the park position in the gears and on the selector might be in proper synchronization on some occasions and not in proper synchronization on other occasions; broken motor mounts can result from excessive torque of the engine, from accidents, from ozonation, and from wear and age; there are five possible causes of loss of synchronization between the gears and the selector; and those causes are broken motor mounts, structural failure in the console, loosening of the nut and bolt utilized to adjust the transmission linkage, bending or abuse of the transmission linkage, and internal defects in the transmission (e.g., in the internal linkage or the detent plate).

As previously stated, the transmission linkage is adjusted for synchronization when the automobile is assembled; such adjustment produces a scoring on the linkage; the linkage herein bears three scorings; and defendant Ames' service order of September 11, 1962, and the answers of its president to interrogatories, indicate that the transmission linkage was adjusted on that date. Mr. Nass, a mechanical engineer called by the plaintiffs, testified that such adjustment indicated that the gearshift and the gears in the transmission were out of synchronization; and that, in his opinion, the necessity for synchronization indicated that something was moving and there could be further trouble if the movements were not corrected, and that synchronization would not remain after the adjustment because defendant Ames had not ascertained and corrected the problem which caused the lack of synchronization. (The motor mounts were not inspected when the linkage was adjusted.) Mr. Croom, an engineer called by defendant Ford, testified that if an adjustment were required, it would indicate either that the linkage was not properly adjusted to begin with, or that something occurred which caused it to be out of adjustment. (He stated several ways in which the transmission could get out of adjustment, such as loosening of the bolt and nut, and bending of the linkage.)

In response to a hypothetical question, based upon assumed facts justified by and embodied in the evidence, Mr. Nass testified in substance that it was his opinion that the automobile rolled down the slope of the parking lot because the transmission internally was not in park-lock; that it was not in park-lock because the engine was "moving around"; and that the engine and shift console were not in proper synchronization because the motor mounts were not restraining the engine and were not holding the engine in position.

Appellants Ford Motor Company and Leon Ames Ford contend, as

above stated, that the court erred in instructing the jury on strict liability in tort. In their opening briefs they argued that strict liability in tort has not been, and should not be, extended to apply to an injured "bystander."

After the opening briefs were filed, the decision in *Elmore* v. *American Motors Corp.*, 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84], was rendered. It was held therein (p. 587) that "the doctrine of strict liability in tort is available in an action for personal injuries by a bystander against the manufacturer and the retailer."[4]

In the reply brief of Ford Motor Company herein, it is stated that the decision in the *Elmore* case is "binding and controlling" herein and that Ford withdraws its argument that the doctrine of strict liability is inapplicable. Ford argues, however, that the instructions given on strict liability did not inform the jury that the defect in the automobile must have existed when the automobile was sold and delivered to D'Ornellas. (Appellant Ames did not file a reply brief.)

In *Elmore* v. *American Motors Corp.*, *supra*, pp. 583-584, it was said (quoting in part from *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], and *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256, 260-261 [37 Cal.Rptr. 896, 391 P.2d 168]): " 'A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.' [Citations.] Similarly, a retailer engaged in the business of distributing automobiles to the public is strictly liable in tort for personal injuries caused by defects in cars sold by it. [Citation.] In the last-cited case, it was recognized that a plaintiff is entitled to establish the existence of the defect and the defendants' responsibility for it by circumstantial evidence. [Citation.] No reason appears why the same rule should not apply where the plaintiff is seeking to prove that the defect caused his injuries. When the evidence is viewed, as it must be, most strongly in favor of plaintiffs, it furnishes an inference that their injuries were proximately caused by a defect in the Rambler which existed at the time of sale." (In *Vandermark, supra*, p. 261, it was said that plaintiffs introduced substantial evidence that they were injured as a result of a "defect that was present in the car when Ford's authorized dealer delivered it to Vandermark.")

---

[4] See *Mitchell* v. *Miller*, 26 Conn.Supp. 142 [214 A.2d 694], where in it was held that strict liability applied to defendant automobile manufacturer where the user of the automobile parked it in park gear on an incline near a golf course and the automobile subsequently rolled down the incline and struck and killed a person who was playing golf on the course.

In the present case, the judge gave the following instructions:

"In this case plaintiff seeks to establish liability against defendants Leon Ames Ford and Ford Motor Company on two different theories: negligence and strict liability. The Court has given you certain instructions on the law of negligence. I will now instruct you on the law pertaining to strict liability which may be established without proof of negligence on the part of the defendant."

"[T]he manufacturer of a product and the retail dealer who place it on the market for use under circumstances where they know that such product will be used without inspection for defects, are liable for injuries proximately caused by defects in the manufacture or design of the product of which the user was not aware, provided the product was being used in a manner which was reasonably foreseeable by the manufacturer at the time the product was placed on the market."[5]

"The law does not permit you to guess or speculate as the cause of the accident in question. If the evidence is equally balanced on the issue of negligence, the existence of a defect in the manufacture or design of the automobile or proximate cause, then your finding must be against the party making the charge on that issue."

The court refused to give the following instruction requested by defendant Ford:

"Both the manufacturer and the retail dealer of a motor vehicle are liable to any person who sustains injury or damage from a defective motor vehicle if the following conditions are established:

"1. The manufacturer places a vehicle upon the open market through its retail dealer for use where they knew or in the exercise of reasonable prudence should know that the vehicle will be used without inspection for defects of the particular part, mechanism, or design which is claimed to have been defective;

"2. The vehicle is in fact defective as claimed in design, manufacture, assembly or adjustment at the time it is sold and delivered by the retail dealer;

"3. The user of the vehicle is unaware of such claimed defect;

"4. The defect, if it existed, made the vehicle unsafe for its intended use;

"5. Such claimed defect is a proximate cause of injury or damage

---

[5]The instruction in this paragraph is similar to the instruction approved in *Preston v. Up-Right, Inc.,* 243 Cal.App.2d 636, 640 [52 Cal.Rptr. 679]. In *Preston,* the court stated in a footnote (p. 641) that the instruction therein was a more appropriate statement of the law than the instruction (BAJI 218-A) given at defendant's request.

occurring while the motor vehicle is being used by such person in the way and for the general purpose for which the vehicle was designed."

Appellant Ford argues that the instructions given stated the law of strict liability in terms which were too general, and that more specific instructions should have been given, especially with reference to informing the jury that the defect in the product must exist when it was sold and delivered.

■ As above shown, the instructions given stated that the manufacturer and the retailer of a product, who place it on the market for use under circumstances where they know that the product will be used without inspection for defects, are liable for injuries proximately caused by defects in manufacture or design of the product of which the user was not aware: that the jury could not guess or speculate as to the cause of the accident; and that if the evidence was equally balanced on the issue of whether there was a defect in the manufacture or design, the jury must find against the party (plaintiffs) making the charge on that issue. ■ The import of those instructions was that the jury, in order to find strict liability, must find that a defect in the manufacture or design existed when the automobile was sold and delivered. The court did not err in instructing the jury on strict liability.

Appellants Ford and Ames also contend that the court erred in instructing the jury on the doctrine of res ipsa loquitur.[6]

The instruction on res ipsa loquitur was given at the request of defendants D'Ornellas and Shay, as modified. (Ford did not request an instruction on res ipsa loquitur, and plaintiff's requested instruction thereon was refused.) The instruction given was as follows:

"From the happening of the accident involved in this case, an inference may be drawn that a proximate cause of the occurrence was some negligent conduct on the part of the defendants Michael Shay and John D'Ornellas. If you should find that the automobile which struck plaintiff was in the exclusive control of the defendants Ford Motor Company and Leon Ames Ford originally, and was not mishandled or otherwise changed after said defendants respectively relinquished control, then from the happening of the accident involved in this case, an inference may be drawn that a proximate cause of the occurrence was some negligent conduct on the part of the defendants Ford Motor Company and Leon Ames Ford or either of them.

---

[6]As previously stated, the matter proceeded to trial on two theories of liability (negligence and strict liability), and the jury returned a general verdict' against the defendants. Ford argues that although no error may have been made in the instructions given on the strict liability theory, the judgment should be reversed if error was made in instructions (res ipsa loquitur) given on the negligence theory. In support of that argument, Ford cites, inter alia, *Schaffer* v. *Claremont Country Club,* 168 Cal.App.2d 351, 358 [336 P.2d 254, 337 P.2d 139], and cases cited therein.

"If you draw such inference of any defendant's negligence then, unless there is contrary evidence sufficient to meet or balance it, you will find in accordance with the inference.

"In order to meet or balance such an inference of negligence, the evidence must show either (1) a definite cause for the accident not attributable to any negligence of that defendant, or (2) such care by that defendant that leads you to conclude that the accident did not happen because of said defendant's lack of care but was due to some other cause, although the exact cause may be unknown. If there is such sufficient contrary evidence you shall not find merely from the happening of the accident that a proximate cause of the occurrence was some negligent conduct on the part of that defendant."

Appellant Ford argues that the doctrine of res ipsa loquitur was not applicable to Ford because it is "equally probable" that the accident was caused by negligence of the driver (Shay) as that it resulted from negligence by Ford. (In support thereof, Ford cites, inter alia, *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 442 [247 P.2d 344]; and *La Porte* v. *Houston*, 33 Cal.2d 167, 169-170 [199 P.2d 665].) Ford argues that there is no evidence that the automobile herein was in the possession or control of Ford after the date (April 4, 1962) when it was sold, and "no evidence that the car was not actually in Park Lock whenever the driver placed the selector in that position at any time between that date and the happening of the accident on September 28, 1962, nor at any time thereafter"; and therefore "It cannot be said that it is more likely than not that the accident was caused by negligence of appellant Ford." As above shown, there was evidence that the front end of the automobile was vibrating soon after the automobile was sold; such vibrating continued for several months thereafter; defective motor mounts could result in such vibrations and could also result in movement of the engine and transmission; such movement could result in loss of synchronization between the selector and the gears so that the gears could be in positions other than park when the gearshift is in the park position on the selector; movement of the engine and transmission (resulting from defective motor mounts) upon acceleration and deceleration of the automobile could be such that there would be synchronization at times and lack of synchronization at other times; and the gearshift was placed in the park position on the selector immediately prior to the time the automobile rolled down the slope and injured the plaintiff. There was also evidence from which it could be inferred that the automobile, as designed and manufactured, was not mishandled or changed after it was sold and delivered. As Ford states in its brief, "in determining whether the doctrine [res ipsa loquitur] is or may be applicable to the appellant, the evidence is to be reviewed most favorably to

plaintiffs-respondents." ■ Under the evidence presented, it cannot be said as a matter of law that it was more likely that the accident resulted from negligence of Shay than that it resulted from negligence of Ford. The doctrine was applicable to Ford. It was also applicable to Ames, which had control of the automobile before it was delivered and on at least three occasions thereafter for the purpose of servicing it.

Appellant Ford argues further that even were it assumed that the doctrine of res ipsa loquitur applied to Ford, the instructions given thereon were inadequate and prejudicially erroneous as to Ford. It argues in effect that said instructions given do not adequately state that Ford had exclusive control of the automobile or that, if Ford relinquished control, the automobile was not improperly handled, or its condition otherwise changed, thereafter. (See *Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682, 691-692 [268 P.2d 1041]; *Zentz* v. *Coca Cola Bottling Co., supra,* p. 444.) It also argues that this is not a case where defendants were in joint control of the automobile—that it is a case where the defendants Ames, D'Ornellas, and Shay successively controlled the automobile after Ford relinquished control; and that plaintiffs did not prove that Ford "was or could be held vicariously responsible for the possession and control of any of these latter parties."

■ As above shown, the instructions specifically limit the application of the doctrine to defendants Ford and Ames, and state in part that an inference of negligence by Ford and Ames or either of them would arise only if the jury found that the automobile was "in the exclusive control of the defendants Ford Motor Company and Leon Ames Ford originally, and was not mishandled or otherwise changed after said defendants respectively relinquished control." The instructions were not inadequate or erroneous as to Ford or Ames.

■ Appellant Ames contends that the evidence does not support the verdict against Ames. This contention is not sustainable. Mr. D'Ornellas complained, on three occasions when Ames serviced the automobile prior to the accident, that the front end was vibrating. There was evidence that defective motor mounts could result in such vibrating; several days before the accident, Mr. D'Ornellas requested that Ames check the front end and the transmission; a respresentative of Ames drove the automobile and tested the transmission and the shifting, and Ames adjusted the transmission linkage; such adjustment is not necessary ordinarily; such adjustment (to regain synchronization) would become necessary if the engine and transmission unit moved forward or backward about .175 inch; defective motor mounts could result in such movement; Ames did not inspect the motor mounts, or otherwise determine why the adjustment of the linkage was necessary; and an expert testified that in his opinion synchroni-

zation would not have been retained after the adjustment unless Ames had determined and corrected the problem which caused the loss of synchronization requiring the adjustment.

█ There was also sufficient evidence to support the verdict against Ames on the theory of strict liability. As previously stated, said doctrine is applicable to a retailer of an automobile which injures a bystander (*Elmore v. American Motors Corp., supra*), and the injured plaintiff "is entitled to establish the existence of the defect and the defendants' responsibility for it by circumstantial evidence." (*Id.,* p. 583.) Viewing the evidence most favorably to the plaintiffs, it could be inferred therefrom that plaintiff Richard's injuries were proximately caused by a defect which existed in the automobile when it was sold. (See *Elmore* v. *American Motors Corp., supra,* pp. 583-584.)

The judgment is affirmed.

Lillie, J., and Thompson, J., concurred.

A petition for a rehearing was denied December 17, 1969, and appellants' petitions for a hearing by the Supreme Court were denied Jaunary 14, 1970.