Dorothy MARTIN and James E. Martin,
Plaintiffs Below, Appellants,

v.

RYDER TRUCK RENTAL, INC., a Florida
Corporation, et al., Defend-
ant Below, Appellee.

Supreme Court of Delaware.

Submitted Sept. 10, 1975.

Decided Feb. 19, 1976.

John M. Bader and Robert Jacobs, Bad-
er, Dorsey & Kreshtool, Wilmington, for
plaintiffs below, appellants.

H. Alfred Tarrant, Jr. and Everett P.
Priestley, Cooch & Taylor, Wilmington,
for defendant below, appellee.

Before HERRMANN, C. J., and DUF-
FY and McNEILLY, JJ.,

HERRMANN, Chief Justice.

We hold today that a bailment-lease of a motor vehicle, entered into in the regular course of a truck rental business, is subject to application of the doctrine of strict tort liability in favor of an injured bystander.

## I.

According to the plaintiffs in this case:

A truck was leased by the defendant, Ryder Truck Rental, Inc., to Gagliardi Brothers, Inc., in the regular course of Ryder's truck rental business.[1] The truck, operated by a Gagliardi employee, was involved in an intersectional collision. Due to a failure of its braking system, the truck did not stop for a traffic light and struck the rear of an automobile which had stopped for the signal, causing that automobile to collide with the vehicle driven by the plaintiff, Dorothy Martin. As a result, she was injured, her car was damaged, and this suit was brought by her and her husband against Ryder.

The plaintiffs base their cause of action solely upon the doctrine of strict tort liability, i. e., tort liability without proof of negligence.[2] The Superior Court granted summary judgment in favor of Ryder,

---

1. The rental was from year to year, covered by a "*Truck Lease and Service Agreement*" under which Ryder agreed, at its own cost and expense:

    "A. To provide from Ryder's garages fuel, oil, lubricants, tires, tubes and all other operating supplies and accessories necessary for the proper and efficient operation of the vehicles.

    "B. To provide fuel, oil and lubricants at service stations authorized and designated by Ryder to furnish such supplies on its behalf, provided, Lessee shall pay to Ryder the amount by which the cost of such fuel (including fuel taxes) to Ryder exceeds the '*maximum fuel allowance*' per gallon indicated on Schedule A for the applicable vehicle.

    "C. To maintain and repair the leased vehicles and furnish all labor and parts which may be required to keep the vehicles in good operating condition. Maintenance shall *include road service due to mechanical* and tire failure.

    In turn, Gagliardi agreed:

    "C. To return each vehicle to Ryder for service and maintenance at the location stated on Schedule A for a minimum of eight hours each week during Ryder's normal business hours, at such *scheduled* time as is agreed by the parties.

    "D. Not to cause or permit any person other than Ryder or persons expressly authorized by Ryder to make repairs or adjustments to vehicles, governors and other accessories. In all cases where repair of vehicles is necessary, Lessee shall notify Ryder by the speediest means of communication available. Ryder will not be responsible for any repair or service while such vehicle is away from Ryder's garage, unless expressly authorized by Ryder and unless Lessee submits an acceptable voucher of the repairs or services."

    The agreement also contained termination and purchase provisions.

2. An early statement of the doctrine of strict tort liability appears in *Restatement (Second) of Torts* § 402A (1965) as follows:

    "§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.

    "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

    (2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

    As to leased chattels, compare *Restatement (Second) of Torts* § 408 (1965):

    "§ 408. Lease of Chattel for Immediate Use

    "One who leases a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel, or to be endangered by its probable use, for physical harm caused by its use in a manner for which, and by a person for whose use, it is leased, if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it."

holding that the doctrine is not applicable to the factual situation here presented. We disagree.

## II.

This is a case of first impression in this Court on the subject of strict tort liability in the law of products liability. *Ciociola v. Delaware Coca Cola Bottling Company,* Del.Supr., 3 Storey 477, 172 A.2d 252 (1961), which was decided prior to the evolution of that doctrine during the 1960's, stood for the proposition that in products liability cases Delaware was committed to the common law rules of privity governing actions in contract based upon implied warranty, and that any change required legislative action. Uniform Commercial Code, 6 Del.C. § 2–318, abrogating such privity requirements, was the legislative response to *Ciociola*.[3] In *Jackson v. Hearn Brothers, Inc.,* Del.Supr., 212 A.2d 726 (1965), this Court disposed of a strict tort liability contention by assuming, without deciding, that such a rule was available,

but concluded that its application was unjustified in that case.

In the Superior Court, *Kates v. Pepsi Cola Bottling Company of Salisbury, Md.,* Del.Super., 263 A.2d 308 (1970); *Moore v. Douglas Aircraft Co.,* Del.Super., 282 A.2d 625 (1971), and *Dillon v. General Motors Corporation,* Del.Super., 315 A.2d 732 (1974), recently touched upon the subject.[4] All were sale cases; none directly addressed the question here presented.

■ The defendant contends that if the Legislature intended to create a strict liability for bailments for hire, it would have done so in the UCC. Thus, the threshold question in the instant case is whether, by the enactment of the UCC and the limitation of its strict warranty provisions to sales, the Legislature has preempted this field of the law of products liability; or whether, the UCC notwithstanding, the courts are free to provide for bailments and leases the alternate, but somewhat conflicting, remedy of strict tort liability.[5]

3.  6 Del.C. § 2–318 provides:

"§ 2–318. *Third party beneficiaries of warranties express or implied.*

"A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section."

The official text of § 2–318, recommended as "Alternative A" by the American Law Institute Draftsman, extended the sellers express or implied warranty to any person "who is in the family or household of his buyer or who is a guest in his home * *." The version of § 2–318 adopted by Delaware was subsequently suggested by the A.L.I. Draftsman as "Alternative B." See 2 L. Frumer & M. Friedman, *Products Liability,* § 16.04[3], at 3–218 (1975). Delaware's variation of § 2–318 was enacted in order to abrogate the privity requirements theretofore prevailing in this State under *Ciociola, supra.* As appears in the Delaware Study Comment to § 2–318:

"The variation in the language of § 2–318 is required to accomplish this purpose because of the decision of the Delaware Supreme Court in *Ciociola v. Delaware Coca Cola Bottling Co.,* 53 Delaware 477, 172 A.2d 252 (1961). In that case the Court

held that Delaware was committed to the common law rule governing actions for breach of implied warranties, and that any change would have to be made by the Legislature rather than the Judicial Branch."

4.  For a careful review of earlier Delaware Superior Court cases dealing with the application of strict tort liability to the owners of dangerous or vicious animals, and to abnormally dangerous instrumentalities and activities, see *Handy v. Uniroyal, Inc.,* D.Del., 327 F.Supp. 596, 603–05 (1971).

5.  For the contrariety of opinion upon the question of legislative preemption in the field of products liability by reason of the enactment of the UCC, see *Markle v. Mulholland's Inc.,* 265 Or. 259, 509 P.2d 529, 535 (1973), especially the concurring opinion of Chief Justice O'Connell, 509 P.2d at 536 *et seq.;* Titus, *Restatement (Second) of Torts Section 402A and the Uniform Commercial Code,* 22 Stan.L.Rev. 713 (1970); Speidel, *The Virginia 'Anti-Privity' Statute: Strict Products Liability Under the Uniform Commercial Code,* 51 Va.L.Rev. 804 (1965); Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases,* 18 Stan.L.Rev. 974 (1966); Dickerson, *The ABC's of Products Liability—With a*

The warranty provisions of Article 2 of the UCC, §§ 2–313 (express) and 2–315 (implied), are clearly limited to the sales of goods; the Statute is "neutral" as to other types of relationships.[6] Manifestly, the Legislature has not preempted the field as to bailments and leases by enactment of the UCC.[7] Silence on the subject may not be deemed to be such preemption.

Hence, we are free, in the common law tradition, to apply the doctrine of strict tort liability to a bailment-lease. The question is whether that course should be adopted; and for that decision, consideration of the nature and evolution of the doctrine is important:

## III.

■ The development of the doctrine of strict tort liability in the law of products liability has evolved rapidly during the past decade, until it has become the prevailing remedy throughout the country. It is now the rule in approximately two-thirds of the states, including Pennsylvania and New Jersey.[8] Prosser, *The Law of Torts* (4th ed.1971); 2 Frumer & Friedman, *Products Liability*, § 16A[3], at 3–248 n. 2 (1975).

Strict tort liability in the field of products liability has developed in a "step by step" process out of the law of contract warranty into the law of tort, for the purpose of the greater protection of the user and the public against defective goods by eliminating the "luggage" and "undesirable complications" of the contract-warranty remedy in direct sales transactions, such as the requirement of a sale and notice, and the provision for limitation and disclaimer, generally prescribed by the Uniform Sales Act and the UCC. See Prosser, *The Law of Torts*, § 97, at 655–56; Prosser, *The Assault Upon the Citadel*, 69 Yale L.J. 1099 (1960); Prosser, *The Fall of the Citadel*, 50 Minn.L.Rev. 791 (1966); 2 Frumer & Friedman, § 16A[4][a], at 3–262.5 *et seq.*

At the forefront of this development was the landmark case of *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), which brought a "breakthrough" in extending strict warranty liability to products other than food and drink.

The first significant application of the strict tort liability concept in a products liability case was the landmark decision of *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), termed "certainly the most important decision since *Henningsen* and perhaps the most important since *MacPherson v. Buick* [217 N.Y. 382, 111 N.E. 1050 (1916)]." 2 Frumer & Friedman § 16A[1], at 3–238. The defendant remote-manufacturer there sought to avoid liability for breach of warranty on a defective power tool on the ground that reasonable notice

*Close Look at Section 402A and the Code*, 36 Tenn.L.Rev. 439 (1969). See also *Chapman v. Brown*, D.Haw., 198 F.Supp. 78 (1961), aff'd, 9th Cir., 304 F.2d 149 (1962); *Larson v. Clark Equipment Co.*, Colo.App., 518 P.2d 308 (1974).

6. The A.L.I. Official Comment to § 2–313 reads:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire * * *. [T]he matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise."

7. Reserved for another day is the question of whether the Legislature has preempted the field as to direct sales cases and whether the warranty provisions of the UCC are, therefore, the exclusive source of strict liability in such cases.

8. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966); *Santor v. A. and M. Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965); but not Maryland, *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 252 A.2d 855 (1969).

of the breach had not been given under the notice requirements of the California Sales Act governing contract warranties. The Court held otherwise, stating:

"A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. * * *

"Although * * * strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, * * * the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed.

"* * * The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best. * * * Implicit in the machine's presence on the market * * * was a representation that it would safely do the jobs for which it was built. * * * To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the [product] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the [product] unsafe for its intended use." 377 P.2d at 900, 901.

Influenced, as were other courts, by *Yuba's* reasoning, the Supreme Court of New Jersey in 1965 abandoned the warranty terminology of *Henningsen* and embraced strict tort liability in *Santor v. A. and M. Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965). Warranty concepts were there side-tracked because:

"As was noted in Henningsen, in seeking justice for ultimate consumers the courts were hard put to find legal mechanisms to overcome the strictures of the long-standing privity of contract requirement. * * * We chose at that time to measure the manufacturer's responsibility under modern marketing conditions by an implied warranty of reasonable suitability of the article manufactured for the use for which it was reasonably intended to be sold. * * *

"It must be said that in the present-day marketing milieu, treatment of the manufacturer's liability to ultimate purchasers or consumers in terms of implied warranty is simply using a convenient legal device or formalism to accomplish the purpose. It has been suggested, however, that conceptually such a doctrine is somewhat illusory because traditionally warranty has had its source in contract. * * * Ordinarily there is no contract in a real sense between a manufacturer and an expected ultimate consumer of his product. The fact is that as a matter of public policy the law has imposed on manufacturers a duty to such persons irrespective of contract or a privity relationship between them. Such concept expressed in terms of breach of implied warranty of fitness or merchantability bespeaks a *sui generis* cause of action. Its character is hybrid, having its commencement in contract and its termination in tort. * * *

"In this developing field of the law, courts have necessarily been proceeding step by step in their search for a stable principle which can stand on its own base as a permanent part of the substantive law. The quest has found sound expression, we believe, in the doctrine of strict liability in tort." 207 A.2d at 311.

Strict tort liability was found preferable to warranty language because:

"The obligation of the manufacturer [must become] what in justice it ought to be—an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves." 207 A.2d at 311–12.

Since *Yuba* and *Santor*, the doctrine of strict tort liability has met with widespread acceptance throughout the country. Consequently, in the past decade, the protection afforded to a person injured by a defective product has been greatly enhanced by the steady and consistent expansion of the concept. The doctrine was developed at the outset for application against remote manufacturers for the protection of users and consumers. See 2 Frumer & Friedman, §§ 16A[1]–[3], at 3–237 *et seq.* It has been in a constant state of refinement and extension, however. One of the extensions of the doctrine has been to bailors and lessors; another has been to injured bystanders. Once again, the leading decisions emanate from California and New Jersey:

### A.

In *Cintrone v. Hertz Truck Leasing, etc.,* 45 N.J. 434, 212 A.2d 769 (1965), the New Jersey Supreme Court applied strict liability in tort to a motor vehicle bailment situation because "[a] bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer"; subjects such a leased vehicle "to more sustained use on the highways than most ordinary car purchasers"; and by the very nature of his business, exposes "the bailee, his employees, passengers and the traveling public * * * to a greater *quantum* of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer." 212 A.2d at 777.

The California Supreme Court endorsed the *Cintrone* "step" in *Price v. Shell Oil Company,* 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970):

"* * * [A] broad philosophy evolves naturally from the purpose of imposing strict liability which 'is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' [Citing *Yuba*]. Essentially the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them. * * *

"* * * [W]e can perceive no substantial difference between *sellers* of personal property and *non-sellers*, such as bailors and lessors. In each instance, the seller or non-seller 'places [an article] on the market, knowing that it is to be used without inspection for defects, * * *.' [Citing *Yuba*] In the light of the policy to be subserved, it should make no difference that the party distributing the article has retained title to it. Nor can we see how the risk of harm associated with the use of the chattel can vary with the legal form under which it is held. Having in mind the market realities and the widespread use of the lease of personalty in today's business world, we think it makes good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers. The former, like the latter, are able to bear the cost of compensating for injuries resulting from defects by spreading the loss through an

adjustment of the rental." 85 Cal.Rptr. at 181, 466 P.2d at 725–26.

The extension of the doctrine of strict tort liability to bailors-lessors has been limited, however, to leases made in the regular course of a rental business, the doctrine being applicable only in a commercial setting by its very nature. *Price, supra,* 85 Cal.Rptr. at 183–84, 466 P.2d at 727–28; *Cintrone, supra,* 212 A.2d at 777. Strict tort liability has been found "peculiarly applicable" to the lessor of motor vehicles in "today's society with 'the growth of the business of renting motor vehicles, trucks and pleasure cars' * * * and the persistent advertising efforts to put one 'in the driver's seat.'" *Price, supra,* 85 Cal. Rptr. at 183, 466 P.2d at 727, quoting from *Cintrone, supra,* 212 A.2d at 776, 777.

For the reasons so well stated by the leading authorities in this field, we are of the opinion that, since the General Assembly has not preempted this area of the field, the common law must grow to fulfill the requirements of justice as dictated by changing times and conditions.

The present-day magnitude of the motor vehicle rental business, and the trade practices which have developed therein, require maximum protection for the victims of defective rentals. This translates into the imposition of strict tort liability upon the lessor. The public policy considerations which appeared in the development of the doctrine during the past decade, are especially relevant where, as in the instant case, the bailor-lessor retains exclusive control and supervision over the maintenance and repair of the motor vehicle it places in circulation upon the highways. All of the societal policy reasons leading to the expansion of strict tort liability in sales cases are equally applicable in this motor vehicle rental case: (1) the concept that the cost of compensating for injuries and damages arising from the use of a defective motor vehicle should be borne by the party who placed it in circulation, who is best able to prevent distribution of a defective product,

and who can spread the cost as a risk and expense of the business enterprise; (2) the concept that the defective motor vehicle was placed on the highways in violation of a representation of fitness by the lessor implied by law from the circumstances and trade practices of the business; and (3) the concept that the imposition upon the lessor of liability without fault will result in general risk-reduction by arousing in the lessor an additional impetus to furnish safer vehicles.

Accordingly, we hold that the doctrine of strict tort liability is applicable to Ryder in the instant case. *Accord, Stang v. Hertz Corporation,* 83 N.M. 730, 497 P.2d 732 (1972); *Stewart v. Budget Rent-A-Car Corporation,* 52 Haw. 71, 470 P.2d 240 (1970); *Coleman v. Hertz Corporation,* Okl.App., 534 P.2d 940 (1975); *Galuccio v. Hertz Corporation,* 1 Ill.App.3d 272, 274 N.E.2d 178 (1971); *see Bachner v. Pearson,* Alaska, 479 P.2d 319 (1970); *Rourke v. Garza,* Tex.Civ.App., 511 S.W.2d 331 (1974).

The remaining question is whether the doctrine is applicable to the case of an injured bystander.

### B.

■ The doctrine of strict liability in tort has been extended to injured bystanders. We endorse the rationale of *Elmore v. American Motors Corporation,* 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969):

"If anything, bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable. Consumers and users, at least, have the opportunity to inspect for defects, * * * where as the bystander ordinarily has no such opportunities. In short, the bystander is in greater need of protection from defective products which are dangerous, and if any distinction should be made between bystanders and users, it should be made * * * to ex-

tend greater liability in favor of the bystanders." 75 Cal.Rptr. at 657, 451 P.2d at 89.

Bystander recovery is the prevailing rule in the application of the doctrine of strict tort liability by the overwhelming weight of authority.[9] Fairness and logic, as well as the philosophy underlying the doctrine, require that an injured bystander be covered in its application. We so hold.

It is noteworthy that under the UCC § 2–318 an injured bystander may be protected as one "affected by" a defective product in a direct sale situation covered by an implied warranty. See *Wasik v. Borg*, 2d Cir., 423 F.2d 44, 48–49 (1970). Thus, the conclusion reached here is in accord with the public policy underlying § 2–318.

### IV.

■ Ryder contends that the imposition of any new measure of liability in this field (1) should be left to the Legislature, citing *Bona v. Graefe*, 264 Md. 69, 285 A. 2d 607 (1972); or (2) should be made effective prospectively only. As to the first point: where, as here, the Legislature has not preempted the field the common law must be kept abreast of the time and must grow to fulfill the demands of justice. As to the second point: these plaintiffs may not be deprived of the benefits of the development of the law they have prompted by their perseverance in this litigation; to do so would render this opinion pure *dictum*. See *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932); Schaefer, *The Control of "Sunbursts"; Techniques of Prospective Overruling*, 42 N.Y.U.L. Rev. 631 (1967). We decline to limit the rulings herein to prospective application.

### V.

To summarize:

■ Under the doctrine of strict tort liability in the instant case, Ryder may be held liable in tort, without proof of negligence, if the truck it placed in circulation proved to have a defect that proximately

9. *Accord, Fulbright v. Klamath Gas Company*, Or.Supr., 533 P.2d 316 (1975); *see Passwaters v. General Motors Corporation*, 8th Cir., 454 F.2d 1270 (1972); *Wasik v. Borg*, 2d Cir., 423 F.2d 44 (1970); *White v. Jeffrey Galion, Inc.*, E.D.Ill., 326 F.Supp. 751 (1971); *Sills v. Massey-Ferguson, Inc.*, N.D.Ind., 296 F.Supp. 776 (1969); *Giberson v. Ford Motor Company*, Mo.Supr., 504 S.W.2d 8 (1974); *Codling v. Paglia*, 32 N.Y. 2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973); *Howes v. Hansen*, 56 Wis.2d 247, 201 N.W.2d 825 (1972); *Elmore, supra; Darryl v. Ford Motor Company*, Tex.Supr., 440 S.W.2d 630 (1969); *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966); *Mieher v. Brown*, 3 Ill.App.3d 802, 278 N.E.2d 869 (1972); *Lamendola v. Mizell*, 115 N.J. Super. 514, 280 A.2d 241 (1971); *Caruth v. Mariani*, 11 Ariz.App. 188, 463 P.2d 83 (1970); *Preissman v. Ford Motor Company*, 1 Cal.App.3d 841, 82 Cal.Rptr. 108 (1969); *Mitchell v. Miller*, 26 Conn.Sup. 142, 214 A.2d 694 (1965); *cf. Ford Motor Company v. Cockrell*, Miss.Supr., 211 So.2d 833 (1968); *see also Klimas v. International Telephone and Telegraph Corp.*, D.R.I., 297 F.Supp. 937 (1969).

Bystander recovery in warranty actions include: *Moss v. Polyco, Inc.*, Okl.Supr., 522 P.2d 622 (1974); *Toombs v. Fort Pierce Gas Company*, Fla.Supr., 208 So.2d 615 (1968); *Piercefield v. Remington Arms Co.*, 375 Mich. 85, 133 N.W.2d 129 (1965); *Cawley v. General Motors Corporation*, 67 Misc.2d 768, 324 N.Y.S.2d 246 (1971). See also *Deveny v. Rheem Manufacturing Company*, 2d Cir., 319 F.2d 124 (1963).

Other materials relating to bystander recovery include: 2 Frumer & Friedman, § 16.04[2][c], at 3–169 *et seq.*; Noel, *Products Liability: Bystanders, Contributory Fault and Unusual Uses*, 50 F.R.D. 321 (1971); Comment, *Strict Product Liability to the Bystander: A Study in Common Law Determinism*, 38 U.Chi.L.Rev. 625 (1971); Noel, *Defective Products: Extension of Strict Liability to Bystanders*, 38 Tenn.L.Rev. 1 (1970); Annot., *Products Liability: Extension of Strict Liability in Tort to Permit Recovery by a Third Person Who Was Neither a Purchaser Nor User of Product*, 33 A.L.R.3d 415 (1970); Note, *Strict Products Liability and the Bystander*, 64 Colum. L.Rev. 916 (1964).

caused personal injury or property damage to the plaintiffs.

\* \* \* \* \* \*

The judgment below is reversed and the cause remanded for further proceedings consistent herewith.

---

DUFFY, Justice (concurring):

I agree with the judgment of the Court and I concur in the opinion. But it seems to me desirable to particularly emphasize that the result is consistent with Delaware statutory policy which provides a remedy to third persons injured under comparable circumstances, and that it is an extrapolation of Delaware decisional law in strict tort liability to the products area. In sum, the result is completely consistent with public policy as expressed by the General Assembly, with our decisional law, with case law which has evolved in many other jurisdictions, and with the plain requirements of justice.

In my view, justice requires that an innocent third person, injured as plaintiff Dorothy Martin alleges she was, have a remedy against the person who caused those injuries. The General Assembly has not provided her with a statutory remedy but, as the opinion notes, the public policy underlying 6 Del.C. § 2–318 is broad enough to permit the Court to rely on it in our evolution of the common law. And, in principle, a bailor-lessor engaged in the business of putting motor vehicles in the stream of traffic is no different from a seller (who is bound by the statute) who does the same thing, cf. *Cintrone v. Hertz Truck Leasing, etc.*, 45 N.J. 434, 212 A.2d 769 (1965). In addition, Delaware has applied the principle of strict tort liability over the years to varying fact situations (where damage had been done by a vicious animal, for example), and while efforts to extend the doctrine have met with mixed results in our Courts, see the comprehensive study by Chief Judge Latchum in *Handy v. Uniroyal, Inc.*, D.Del., 327 F. Supp. 596 (1971), this case is a reasonable enlargement in the products liability field. And the case law which has emerged so rapidly in recent years in other jurisdictions certainly supports our result.